## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE MEDTRONIC, INC. DERIVATIVE LITIGATION<br><br>This Order Relates to:<br><br>ALL ACTIONS | Case No. 14-cv-3540 (SRN/JJK)<br><br>**MEMORANDUM OPINION AND ORDER** |

Brett D. Stecker, James. M. Ficaro, Jeffrey J. Ciarlanto, and Robert B. Weiser, The Weiser Law Firm, PC, 22 Cassatt Avenue, First Floor, Berwyn, PA 19312; Edward B. Gerard, Justin D. Rieger, and Stephen J. Oddo, Robbins Arroyo, LLP, 600 B Street, Suite 1900, San Diego, CA 92101; June Pineda Hoidal, Patricia A. Bloodgood, and Carolyn G. Anderson, Zimmerman Reed PLLP, 80 South Eighth Street, Suite 1100, Minneapolis, MN 55402, for Plaintiffs.

Peter W. Carter, Michelle S. Grant, James K. Nichols, Dorsey & Whitney LLP, 50 South 6th Street, Suite 1500, Minneapolis, MN 55402; Gerardo Alcazar, Robbins Kaplan Miller & Ciresi LLP, 800 LaSalle Ave, Suite 2800, Minneapolis, MN 55402; Jerry W. Blackwell and S. Jamal Faleel, Blackwell Burke PA, 431 South 7th Street, Suite 2500, Minneapolis, MN 55415, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

### I.    INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction

[Doc. No. 24].  For the reasons set forth below, the Court denies Plaintiffs' motion.

### II.    BACKGROUND

Plaintiffs William A. Houston ("Houston") and Marilyn Clark ("Clark")

[collectively, "Plaintiffs"], on behalf of Nominal Defendant Medtronic, Inc. ("Medtronic

or "the Company"), bringing this Motion for Preliminary Injunction seeking to enjoin

Medtronic's Board of Directors ("the Board") from using Medtronic shareholder funds to reimburse Defendants for their personal tax liabilities owed to the United States government.  (See Pls.' Mem. at 1 [Doc. No. 26].)  The Defendants' personal tax liabilities stem from Medtronic's proposed merger with Covidien plc ("Covidien").  Below, the Court discusses in more detail the identity of the parties, the proposed merger, the proposed tax reimbursements, and Plaintiffs' claims.

### A. Parties

Plaintiffs currently hold an undisclosed number of shares of Medtronic.  (Compl. ¶ 4 [Doc. No. 1]; see In re Medtronic, Inc. Derivative Litigation, No. 14-cv-4142, Compl. ¶ 11 [Doc. No. 1].)  As mentioned above, Plaintiffs bring this derivative action on behalf of themselves and Medtronic's other shareholders.

Defendants are members of Medtronic's Board of Directors and Does 1-5.  Defendant Omar Ishrak has served as the Company's president, Chief Executive Officer ("CEO"), and Chairman of the Board since 2011.  (Compl. ¶ 6 [Doc. No. 1].)  Defendant Gary L. Ellis has served as the Company's Vice President and Chief Financial Officer ("CFO") since 2005.  (Id. ¶ 7.)  Defendant Christopher J. O'Connell is Medtronic's Executive Vice President and Group President of Restorative Therapies Group.  (Id. ¶ 8.)  He has been in this role since 2009.  (Id.)   Defendant Michael J. Coyle has served as Medtronic's Executive Vice President and Group President of the Cardiac and Vascular Group since 2009.  (Id. ¶ 9.)  Defendant Carol A. Surface is Medtronic's Senior Vice President and Chief Human Resources Officer.  (Id. ¶ 10.)  Surface has been in this position since September 2013.  (Id.)

2

Medtronic's Board of Directors is composed of Ishrak, Ellis, O'Connell, Coyle, Surface, and nine other individuals, including: Richard H. Anderson, Scott C. Donnelly, Shirley Ann Jackson, Michael O. Leavitt, James T. Lenehan, Denise M. O'Leary, Kendall J. Powell, Robert C. Pozen, and Preetha Reddy.  (Id. ¶¶ 11-21.)  While Ishrak, Ellis, O'Connell, Coyle, and Surface are employed by Medtronic, Anderson, Donnelly, Jackson, Leavitt, Lenehan, O'Leary, Powell, Pozen, and Reddy are "Non-Employee Director Defendants."  (Id. ¶ 22.)

Does 1-5 are individuals whose identities are presently unknown to Plaintiffs.  (Id. ¶ 20.)  Plaintiffs refer to Defendants Ishrak, Ellis, O'Connell, Coyle, Surface, Anderson, Donnelly, Jackson, Leavitt, Lenehan, O'Leary, Powell, Pozen, Reddy, and Does 1-5, collectively, as "Defendants."  (Id. ¶ 21.)

Plaintiffs claim that because of their positions as Directors, "Defendants owe[] Medtronic and its shareholders fiduciary obligations of good faith, loyalty, candor, and were and are required to use their utmost ability to control and manage Medtronic in a fair, just, honest, and equitable manner."  (Id. ¶ 23.)  Moreover, Plaintiffs claim that Defendants must act to further the best interests of Medtronic and its shareholders, "so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit."  (Id.)

### B.  Proposed Merger or Proposed Inversion

Plaintiffs' lawsuit arises from "Defendants' efforts to complete the sale of Covidien . . . to the Company, Medtronic Holdings Limited . . . a private limited company organized under the laws of Ireland that will be registered as a public limited

3

company and renamed Medtronic plc ["New Medtronic"] at or prior to the completion"

of the proposed transaction.  (Id. ¶ 26.)  Simply put, if the shareholders approve this

transaction, Medtronic would be re-incorporated under the laws of Ireland, and become

the "New Medtronic."  (See id.)  This transaction is known as an "inversion."  (Id. ¶ 27.)

"An inversion is a corporate merger where a U.S. based company merges with a foreign

corporation to create a new corporate entity that is incorporated outside the United States

of America.  For tax purposes, the new entity becomes foreign owned, which reduces the

company's overall tax liability."  (Id.)  Accordingly, the Court proceeds by referring to

this proposed merger, as the "Proposed Inversion."  As a result of the Proposed Inversion,

current shareholders of Metronic would receive one share of New Medtronic for each

share of Medtronic common stock they own.  (See Pls.' Mem. at 4 [Doc. No. 26].)

On July 14, 2014, Defendants filed a preliminary joint Proxy statement ("the

Proxy"), on behalf of New Medtronic.  (Id. ¶ 26.)  Defense counsel provided a bound

hard copy of the most recent version of the Proxy to the Court during the hearing.  (See

also Grant Decl., Ex. A "Medtronic Holdings Limited Registration Statement on Form S-

4" [Doc. No. 37-1].)  The Proxy represents that the transactions contemplated are in the

best interest of the Company and its shareholders, and recommends "that the Company's

shareholders vote in favor" of the Proposed Inversion.  (Compl. ¶ 26 [Doc. No. 1].)

### C.  Tax Liability Resulting From Inversions

Section 4985 of the U.S. Tax Code imposes an excise tax on officers and directors

of an inverting corporation who are subject to the reporting requirements of section 16(a)

of the Securities Exchange Act of 1934.  See 26 U.S.C. § 4985.  The excise tax amounts

to fifteen percent of a covered officer or director's stock-based compensation, including stock options, held during the period beginning six months before and ending six months after the close of the inversion transaction.  Plaintiffs allege that the House of Representatives' Committee on Ways and Means explained that this tax was imposed in order to ensure that officers and directors were taxed at an equivalent rate as shareholders, who are taxed at a fifteen percent capital gains rate, upon the completion of an inversion.  (Compl. ¶ 29 [Doc. No. 1].)  Thus, shareholders of a company who own half or more, by vote or value, of the outstanding stock of the foreign parent immediately after the inversion is complete, must pay taxes on any gain from the transaction.  (Id. ¶ 30.)

### D.  Tax Reimbursements and Gross-Up Payments

The Board announced that if the Proposed Inversion is approved by the shareholders, then the Company will reimburse Board members for their excise tax burdens.  (Id. ¶ 31.)  Since the payment of the excise tax to each director or officer is itself a taxable event, see 26 U.S.C. § 4985, Medtronic plans to pay Defendants additional money in order to cover the tax liability that would result from receiving the excise tax reimbursements.  (Compl. ¶ 37 [Doc. No. 1].)  Plaintiffs refer to (1) the tax reimbursements, and (2) the additional payment used to cover the tax liability that would result from receiving the tax reimbursements, collectively as the "Gross-Up Payments." (See Pls.' Mem. at 1 [Doc. No. 26].)  Thus, the Court uses this term throughout its Order.

Plaintiffs allege that in total, Defendants, including Does 1-5, will be reimbursed $63 million.  (Id. ¶ 31.)  Ishrak will allegedly receive $24,750,381.  (Id. ¶ 6.)  Ellis will

allegedly receive $7,623,633.  (Id. ¶ 7.)  O'Connell will allegedly receive $6,685,665 in tax reimbursements from the Company.  (Id. ¶ 8.)  Coyle will allegedly receive $5,348,569 in tax reimbursements.  (Id. ¶ 9.)  And, Surface will allegedly receive $2,617,141 in tax reimbursements.  (Id. ¶ 10.)  The Non-Employee Directors will allegedly collectively receive $5.5 million in tax reimbursements.  (Id. ¶ 42(b).)  Further, "upon information and belief," Plaintiffs allege that Does 1-5 will collectively receive tax reimbursements of $10.5 million.  (Id. ¶ 20.)

Although Plaintiffs allege in their Complaint that the Proxy did not "disclose that Defendants intended to 'reimburse' themselves with respect to the excise tax requirement," (id. ¶ 35), in fact, the Proxy details precisely the amount of money that each officer would be reimbursed (see Grant Decl., Ex. A "Medtronic Holdings Limited Registration Statement on Form S-4" at 125-28 [Doc. No. 37-1]).  Moreover, in Plaintiffs' memorandum, they explicitly rely on the precise reimbursements set forth in the Proxy.  (See Pls.' Mem. at 6 [Doc. No. 26].)

### E.  Procedural Posture and Plaintiffs' Claims

Plaintiffs claim that by simply recommending the Gross-Up Payments, the Board is liable for breaching their fiduciary duties and unjustly enriching themselves.  (Compl. ¶¶ 43-58 [Doc. No. 1].)  Plaintiffs did not make any demand on the present Board to institute this action because Plaintiffs allege that "such a demand would be a futile, wasteful, and useless act."  (Id. ¶ 42.)  Thus, on September 19, 2014, Plaintiffs brought this action, derivatively in the right and for the benefit of Medtronic, to redress the alleged breaches of fiduciary duty.  (Id. ¶ 40.)

Plaintiffs state four counts against Defendants.  In Count One, Plaintiffs allege that Defendants breached their fiduciary duties because they recommend receipt of "illicit and egregious tax reimbursements."  (Id. ¶¶ 43-46.)  In Count Two, Plaintiffs allege that Defendants unjustly enriched themselves through these tax reimbursements, at the expense of, and to the detriment of, Medtronic.  (Id. ¶¶ 47-49.)  Plaintiffs allege in Count Three that Defendants are liable to the Company for waste for recommending the tax reimbursements.  (Id. ¶¶ 50-53.)  Finally, in Count Four, Plaintiffs allege that Defendants are liable for violating section 14(a) of the Securities Exchange Act of 1934 for creating a Proxy that contained "false or misleading" statements.  (Id. ¶¶ 54-58.)  Specifically, Plaintiffs contend that the Proxy was misleading because it failed to disclose that Defendants intended to "reimburse" themselves with respect to the excise tax requirement.  (Id. ¶ 56.)

Plaintiffs do not challenge the underlying Proposed Inversion.  Rather they only seek to preliminarily enjoin the Gross-Up Payments.  (See Pls.' Mem. at 1 [Doc. No. 26].)  Shareholders will have the opportunity to vote on whether to approve both the Proposed Inversion, and the Gross-Up Payments, during their shareholder meeting on January 6, 2014.  (See 12/16/14 Hr'g Tr. 18:5-10 [Doc. No. 45].)  In fact, Defense counsel stated during the hearing that the shareholders will take an additional advisory vote "with respect to the portion of this excise tax reimbursement that's being paid to the section 16 officers, which is 90 percent of the amount."  (Hr'g Tr. 18:11-15).  Neither party explained the legal significance of an "advisory vote," as opposed to a general

shareholder vote.  Nonetheless, it appears that Plaintiffs will have the opportunity to vote in favor, or against, the underlying Proposed Inversion and the Gross-Up Payments.

On October 23, 2014, Plaintiffs filed a Motion for Preliminary Injunction [Doc. No. 24], pursuant to Rule 65(a) of the Federal Rules of Civil Procedure.  Plaintiffs also filed a supporting memorandum [Doc. No. 26].  Plaintiffs contend that a preliminary injunction is necessary before the shareholders vote on the Proposed Inversion and the Gross-Up Payments at the meeting on January 6, 2014.  (See Grant Decl., Ex. A "Medtronic Holdings Limited Registration Statement on Form S-4" [Doc. No. 37-1].) Defendants filed their opposition brief on November 21, 2014 [Doc. No. 36], and supplemented the brief with a declaration and several exhibits [Doc. No. 37].  Nominal Defendant Medtronic, Inc. also filed its opposition memorandum on November 21, 2014 [Doc. No. 35].  On December 12, 2014, Plaintiffs filed their reply brief [Doc. No. 43]. The Court heard oral argument on Plaintiffs' motion on December 16, 2014.  (See generally Hr'g Tr. [Doc. No. 45].)

## III.   DISCUSSION

### A.  Standard of Review

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (citation omitted).  A district court must consider four factors in determining whether preliminary injunctive relief is warranted: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public

interest." Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (citing Dataphase

Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981)).  The Court refers to these

four factors as "the Dataphase factors."

Although the overall analysis of the four relevant factors is generally a flexible

one, a likelihood of actual irreparable harm remains essential, and the movant's burden

on that factor may not be diminished on a strong showing of the other three factors.  Ellis

v. Minnesota Dep't of Human Servs., No. 11-cv-3411, 2011 WL 6004015, at *4 n.2 (D.

Minn. Nov. 30, 2011) (citing Winter v. Natural Resources Defense Council, Inc., 555

U.S. 7, 22 (2008)).

In analyzing these factors, "'a court should flexibly weigh the case's particular

circumstances to determine whether the balance of equities so favors the movant that

justice requires the court to intervene.'"  Hubbard Feeds, Inc. v. Animal Feed

Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999) (quoting United Indus. Corp. v.

Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998)).  Nonetheless, the burden of

establishing the four Dataphase factors lies with the moving party.  Watkins Inc., 346

F.3d at 844 (citation omitted).

While "no single factor is determinative," Dataphase Sys., Inc., 640 F.2d at 113,

the likelihood of success factor is the most important, Barrett v. Claycomb, 705 F.3d 315,

320 (8th Cir. 2013) (citation omitted).  Therefore, in order to obtain a preliminary

injunction, the moving party must show that it has a "fair chance of prevailing" on its

claims.  Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir.

2008).  "[A]n injunction cannot issue if there is no chance of success on the merits."

Mid-Am. Real Estate Co. v. Iowa Realty Co., 406 F.3d 969, 972 (8th Cir. 2005) (citations

omitted).  However, the question is not whether the moving party has "'prove[d] a greater

than fifty percent likelihood that he will prevail.'"  PCTV Gold, Inc. v. SpeedNet, LLC,

508 F.3d 1137, 1143 (8th Cir. 2007) (quoting Dataphase Sys., Inc., 640 F.2d at 113).

Rather, the question is whether any of the movant's claims provides "fair ground for

litigation."  Watkins Inc., 346 F.3d at 844 (citation and internal quotation marks omitted).

     As part of the analysis of the "likelihood of success" factor, the Court must

determine if the Plaintiffs have adequately alleged either that they have made a demand

on the Board to address their complaints, or that demand is futile.  See Minn. R. Civ. P. §

23.09 (2014).  Minnesota Rule of Civil Procedure 23.09 requires that, in a derivative

action brought by a shareholder to enforce a right of a corporation, the complaint must

allege with particularity "the efforts, if any, made by the plaintiff to obtain the action

plaintiff desires from the directors or comparable authority and . . . the reasons for

plaintiff's failure to obtain the action or for not making the effort."  See Minn. R. Civ. P.

§ 23.09.  The decision to pursue a legal claim on behalf of a corporation involves "the

weighing and balancing of legal, ethical, commercial, promotional, public relations, fiscal

and other factors familiar to the resolution of many if not most corporate problems."

Janssen v. Best & Flanagan, 662 N.W.2d 876, 883 (Minn. 2003) (internal quotation

marks and citation omitted).  Therefore, this task "is [often] best done by the board of

directors, which is familiar with the appropriate weight to attribute to each factor given

the company's product and history."  Id.

Consistent with prior rulings in this Court, the Court finds that Minnesota law governs the demand issue as Medtronic is, at least for now, a Minnesota corporation. Markewich ex rel. Medtronic, Inc. v. Collins, 622 F. Supp. 2d 802, 807-08 (D. Minn. 2009) (citing Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 108-09 (1991) (explaining that "federal courts should incorporate state law into federal common law unless the particular state law in question is inconsistent with the policies underlying the federal statute")).  Under Minnesota law, a plaintiff must first make a demand on a corporation's board of directors before filing a derivative action.  Winter v. Farmers Educ. & Co-op. Union of Am., 107 N.W.2d 226, 233 (Minn. 1961).

However, the Minnesota Supreme Court held in Winter that a derivative plaintiff[1] need not make a demand where doing so would be futile.  Winter, 107 N.W.2d at 233. "The determination of demand futility is a mixed question of law and fact left to the discretion of the district court."  In re Xcel Energy, Inc., 222 F.R.D. 603, 606 (D. Minn. 2004) (citing Prof'l Mgmt. Assocs., Inc. v. Coss, 598 N.W.2d 406, 410 (Minn. Ct. App. 1999)).  The Winter Court held that a demand is excused only if "it is plain from the circumstances that [demand] would be futile."  107 N.W.2d at 234 (citation omitted).  "In practice, showing that demand would be futile is . . . [exceedingly] difficult under Minnesota law," given the existence of § 302A.241 of the Minnesota Business Corporations Act.  See Louisiana Municipal Police Employees Retirement System v. Finkelstein, et al., No. 27-cv-11-23986, at 8 (Hennepin Cnty. Dist. Ct. May 29, 2012).

---

[1]     A derivative plaintiff is a shareholder bringing a lawsuit "to enforce a corporate cause of action."  Price v. Gurney, 324 U.S. 100, 105 (1945).

Section 302A.241 permits the board of directors of a Minnesota corporation to refer a shareholder demand to a special litigation committee ("SLC") to "consider legal rights or remedies of the corporation and whether those rights and remedies should be pursued."  Minn. Stat. § 302A.241, subd. 1 (2014).  The statute provides that an SLC may consist "of one or more independent directors or other independent persons to consider legal rights or remedies of the corporation and whether those rights and remedies should be pursued."  See Minn. Stat. § 302A.241, subd. 1.  SLCs "enable a corporation to dismiss or settle a derivative suit despite a conflict of interest on the part of some or all directors."  In re United Health Group Inc. Shareholder Derivative Litigation, 754 N.W.2d 544, 550-51 (Minn. 2008).

Section 302A.241 was originally codified in 1981.  See 1981 Minn. Laws 1168 (stating that "the board may establish a committee composed of two or more disinterested directors or other disinterested persons to determine whether it is in the best interests of the corporation to pursue a particular legal right or remedy of the corporation and whether to cause the dismissal or discontinuance of a particular proceeding that seeks to assert a right or remedy on behalf of the corporation").  Therefore, the Winter Court, which issued its decision in 1961, did not analyze the effect that this statutory provision has on demand futility under Minnesota law.  Nonetheless, even before this statutory provision existed, Winter clearly held that a derivative lawsuit is an "extraordinary remedy" available only when "no other road to redress" is available.  Winter, 107 N.W.2d at 233; see Kococinski v. Collins, 935 F. Supp. 2d 909, 917 (D. Minn. 2013).

In light of § 302A.241, the <u>Winter</u> Court's caution, about the limited circumstances in which demand futility exists, rings even more true.  As one Minnesota court stated, "demand is not futile even if a majority of a Minnesota corporation's directors are implicated in the alleged wrongdoing, because [an SLC] of disinterested directors and/or unaffiliated persons can always be appointed to consider a demand." <u>Louisiana Municipal Police Employees Retirement System</u>, No. 27-cv-11-23986, at 9 (Hennepin Cnty. Dist. Ct. May 29, 2012) (citing <u>In re Buca, Inc. Shareholder Derivate Litigation</u>, No. 05-4418, at 5 (Hennepin Cnty. Dist. Ct. Nov. 9, 2005) (Burke, J.)).

Pursuant to this standard, Plaintiffs have not shown any likelihood of success against Defendants because they do not adequately allege demand futility.

### B.  Likelihood of Success: Demand Futility

Plaintiffs argue that they have sufficiently alleged that demand is futile, "[g]iven that every director on the Board will directly benefit from the Gross-Up Payments that they authorized for themselves."  (<u>See</u> Pls.' Mem. at 12 [Doc. No. 26].)  They contend that since the Board members are directly interested parties they are unable to "exercise [their] independent business judgment without being influenced by the adverse personal consequences resulting from the decision" to approve the tax reimbursements.  (<u>See</u> <u>id.</u> at 12-13 (citing <u>Rales v. Blasband</u>, 634 A.2d 927, 936 (Del. 1993)).)  Plaintiffs proceed by citing a number of cases in which courts have held that demand was futile.  (<u>See</u> Pls.' Mem. at 13 [Doc. No. 26].)  However, all of these cases are controlled by Delaware state law, as opposed to Minnesota state law.

Since Delaware and Minnesota law differ with respect to the requirements for demonstrating demand futility, the Court disregards the cases Plaintiffs cite. "In Delaware, demand may be [excused] if the particularized facts create a 'reasonable doubt' that a majority of the board would be disinterested and independent, or that the transaction was the product of the directors' good faith business judgment." <u>Louisiana Municipal Police Employees Retirement System</u>, No. 27-cv-11-23986, at 8 (Hennepin Cnty. Dist. Ct. May 29, 2012) (citing <u>Aronson v. Lewis</u>, 473 A.2d 805, 814 (Del. 1984), <u>overruled on other grounds by Brehm v. Eisner</u>, 746 A.2d 244 (Del. 2000)). However, "Minnesota courts have specifically refused to 'adopt blindly' the Delaware approach [to demand futility] as doing so in certain situations would be 'at odds' with general principles of Minnesota law." <u>Haberle v. Baker</u>, No. 05-cv-315 (DWF/JSM), 2005 WL 2105543, at *3 (D. Minn. Aug. 30, 2005) (quoting <u>Reimel v. MacFarlane</u>, 9 F. Supp. 2d 1062, 1067 n.7 (D. Minn. 1998)). Thus, while the Court agrees with Defendants that Minnesota courts often look to Delaware law for assistance in developing rules of corporate law, here, the Court strictly adheres to Minnesota law for the demand futility test.

While Plaintiffs argue that demand is futile, Defendants contend that even if the majority of Directors are not disinterested, demand is not futile. (<u>See</u> Defs.' Opp'n at 7 [Doc. No. 36].) They point to Minn. Stat. § 302A.241, subd. 1, which states that the Board may respond "to a derivative demand by appointing a special litigation committee . . . to consider[] the demand and determine whether the company should pursue the claim." (<u>Id.</u> at 7-8.) Defendants emphasize that the SLC may be composed of "one or

more independent directors or other independent persons." <u>See</u> Minn. Stat. § 302A.241,

subd. 1 (2014).[2]   Nominal Defendant Medtronic generally echoes Defendants' arguments

in its own briefing.  (<u>See</u> Nominal Def.'s Opp'n at 2-8 [Doc. No. 35].)  Additionally,

however, Nominal Defendant Medtronic emphasizes that the SLC not only acts

independently on behalf of the corporation, but also makes "binding determinations as to

whether the corporations' rights or remedies should be pursued by the corporation."  (<u>Id.</u>

at 4 (citing Minn. Stat. § 302A.241, subd. 1; <u>In re United Group, Inc. Shareholder</u>

<u>Derivative Litig.</u>, 754 N.W.2d 544, 550 (Minn. 2008) (analyzing Minnesota state law,

and explaining that "[b]y implication, then, an SLC is not subject to a board's discretion

and control.")).)

    As explained above, the Minnesota Supreme Court has established a stringent test

for determining demand futility: a shareholder must make a demand upon a company's

board of directors unless "it is plain from the circumstances that it would be futile."

<u>Winter</u>, 107 N.W.2d at 234.  Although Plaintiffs correctly argue that Minnesota is not a

universal demand state, demand in Minnesota is only excused if Plaintiffs demonstrate

that "no possibility that the board will consider the merits of the demand" exists.  <u>Reimel</u>

<u>v. MacFarlane</u>, 9 F. Supp. 2d 1062, 1066 (D. Minn. 1998).  Here, Plaintiffs have not

---

[2]    In contrast, Delaware law does not permit directors to appoint a committee that
includes non-directors as members; therefore, the focus of Delaware's demand futility
test is upon the composition of the board.  <u>See</u> Del. Code Ann. tit. 8, § 141(c) (2014)
(stating that "[t]he board may designate 1 or more directors as alternate members of any
committee, who may replace any absent or disqualified member at any meeting of the
committee.").

demonstrated that the Board was so self-interested or conflicted that no possibility existed that it would respond to the demand request.

As Defendants aptly note, if Plaintiffs made a demand, the Board could then appoint an SLC, pursuant to Minn. Stat. § 302A.241, subd. 1. (See Defs.' Opp'n at 8 [Doc. No. 36].)  In fact, Medtronic utilized an SLC in 2012 to address a shareholder's claims for breach of fiduciary duties, corporate waste, unjust enrichment, and indemnification.  (See Grant Decl., Ex. B "State District Court Order in Himmel v. Ellis, et al." at 3 [Doc. No. 37-2].)   If past is prologue, then the Board's past reliance on an SLC demonstrates that there is a possibility that the Board would again consider the merits of Plaintiffs' demand by convening another SLC.

Moreover, the parties agree that not all members of the Board are self-interested with respect to the Gross-Up Payments.  (See Defs.' Mem. at 8 [Doc. No. 36]; Pls.' Mem. at 6 [Doc. No. 26].)  One Board member, Dr. Elizabeth Nabel, will not receive a tax reimbursement.  (See id.)  Since an SLC may consist of a single "independent director," see Minn. Stat. § 302A.241, subd. 1, Dr. Nabel is fully competent to consider Plaintiffs' demand.  Furthermore, even if Dr. Nabel did benefit from the Gross-Up Payments, the Board could appoint an SLC consisting of "other independent persons" to address Plaintiffs' concerns.  See id.

Throughout Plaintiffs' briefs they rely on a number of cases from this District that mischaracterize Minnesota's current law on demand futility.  These cases include Reimel, In re Patterson Companies, Inc. Securities, Derivative & ERISA Litigation, 479 F. Supp. 2d 1014, 1039 (D. Minn. 2007), and In re Xcel Energy, Inc., 222 F.R.D. 603 (D. Minn.

2004).  As an initial matter, the Court notes that all three of these cases fail to discuss Minn. Stat. § 302A.241, subd. 1, or a board of directors' option to create an SLC in order to address a shareholder's demand.  The Court proceeds by discussing how Plaintiffs' reliance on each case is misplaced because of each court's failure to analyze § 302A.241.

Plaintiffs contend that Reimel, a 1998 decision from this District, stands for two principles: that demand is futile if (1) a majority of the Board is composed of alleged wrongdoers; or (2) the Board's conduct was allegedly patently egregious.  (See Pls.' Reply at 8 [Doc. No. 43].)  The Court disagrees with Plaintiffs' characterizations, and finds that Plaintiffs misstate the demand futility test under current Minnesota law.

As to the "majority board" rule, Plaintiffs take the Reimel Court's statement out of context.  The Reimel Court itself explained that in Winter, the Minnesota Supreme Court "did not declare that demand is always futile when the alleged wrongdoers are a majority, regardless of the particular circumstances of the case."  Reimel, 9 F. Supp. 2d at 1066. "Such an interpretation [would] ignore[] the remainder of Winter's discussion, which indicates that demand is excused only if there is no possibility that it could lead to a resolution and suggests that a court should analyze the particular circumstances of the case before it in making a futility determination."  Id.  Thus, under Reimel's own holding, demand is futile "only when there is 'no other road to redress.'"  Id. at 1065 (citing Winter, 107 N.W.2d at 233).  Here, another road to redress exists as the Board may convene an SLC to address Plaintiffs' concerns.  Moreover, Reimel's lack of discussion of § 302A.241 makes its analysis significantly less persuasive.  The Winter Court did not have the benefit of analyzing how § 302A.241 affected the defendant's

17

demand futility claim, because the statutory provision did not yet exist in 1961. In contrast, § 302A.241 was codified by the time the Reimel Court issued its decision in 1998. However, the Reimel Court simply relied on the language in Winter and did not reconcile Winter's holding with § 302A.241.

As to the "patently egregious conduct" rule, the Court finds that the Reimel Court did not analyze relevant statutory authority when it pronounced this rule. In Reimel, the court explained that demand is almost always futile "in cases involving allegations of patently egregious conduct such as converting corporate funds or self-dealing." Reimel, 9 F. Supp. 2d at 1066. The Reimel Court supported its assertion by citing two Minnesota Supreme Court cases: (1) Grudnosky v. Bislow, 88 N.W.2d 847 (Minn. 1958) (holding demand futile where defendants misappropriated funds), and (2) Rothwell v. Robinson, 38 N.W. 772 (Minn. 1888) (finding demand futile where directors misappropriated corporate resources for benefit of partnership of which director was a member). See Reimel, 9 F. Supp. 2d at 1066 n.6. In fact, the Minnesota Supreme Court also cited Grudnosky and Rothwell in Winter, when it stated that "[w]e have held that such demand is not required where it is plain from the circumstances that it would be futile." Winter, 107 N.W.2d at 234.

However, Grudnosky, Rothwell, and Winter pre-date Minn. Stat. § 302A.241, which was not codified until 1981. See 1981 Minn. Laws 1168. Therefore, the Grudnosky Court, the Rothwell Court, and the Winter Court do not discuss an SLC as an alternative option for boards to investigate shareholders' complaints. Thus, Reimel's reliance on these cases is not persuasive. Moreover, it is unclear whether, under current

Minnesota law, demand is futile even when a board is accused of patently egregious conduct since a board could simply appoint a group of independent, disinterested individuals to address a shareholder's demand. Accordingly, the Court disagrees with Plaintiffs' argument, and <u>Reimel</u>'s characterization of the law, that demand is almost always futile when self-dealing is alleged.

Plaintiffs' reliance on <u>In re Patterson</u> is also misplaced. In <u>In re Patterson</u>, the court held that demand was not futile because the alleged wrongdoing by the directors did "not rise to the level of 'patently egregious' conduct that might render demand per se futile." <u>In re Patterson</u>, 470 F. Supp. 2d at 1039 (citing <u>Reimel</u>, 9 F. Supp. 2d at 1066)). As the Court explained above, it is unclear whether the "patently egregious conduct" standard for demand futility remains good law, given the existence of § 302A.241. Therefore, although the Court agrees with the ultimate holding in <u>In re Patterson</u>, the Court respectfully disagrees with the analysis.

The Court also takes issue with Plaintiffs' reliance on <u>In re Xcel Energy, Inc.</u> In that case, the court held that pre-suit demand was not excused because the plaintiff had failed to meet the elements required under Delaware state law. <u>See</u> <u>In re Xcel Energy, Inc.,</u> 222 F.R.D. at 607-08. As the Court explained in detail above, Delaware and Minnesota law differ greatly with respect to demand futility. While under Delaware law, pre-suit demand is excused if a majority of the directors are allegedly self-interested, under Minnesota law, the majority rule does not apply, and a board of directors may always appoint an SLC. <u>See</u> <u>Haberle v. Baker</u>, 2005 WL 2105543, at *3 (explaining that "Minnesota courts have specifically refused to 'adopt blindly' the Delaware approach [to

19

demand futility] as doing so in certain situations would be 'at odds' with general principles of Minnesota law.").  Therefore, although the Court agrees with the ultimate holding in In re Xcel Energy, Inc., the Court respectfully disagrees with the analysis and its applicability to this case.[3]

Plaintiffs also erroneously argue that their case is akin to three other cases in which courts determined that demand was futile: (1) Corporation Commission of Mille Lacs Band of Ojibwe Indians v. Money Centers of America, Inc., [hereinafter "Ojibwe"] No. 12-cv-1015 (RHK/LIB), 2013 WL 5487419 (D. Minn. Sept. 30, 2013); (2) In re AFC Enterprises, Inc. Derivative Litigation, 224 F.R.D. 515 (N.D. Ga. 2004); and (3) Rothwell v. Robinson, 38 N.W. 772 (Minn. 1888).  (See Pls.' Reply at 9 [Doc. No. 43].)  The Court finds that each of these cases is distinguishable.

In Ojibwe, the plaintiff alleged that demand was futile because one of the board members was allegedly culpable of pocketing funds, and the other board member was the

---

[3]    For the same reasons, the Court takes issue with the analysis in Kococinski v. Collins, 935 F. Supp. 2d 909 (D. Minn. 2013).  In Kococinski, the court held that plaintiff failed to establish that demand was futile.  See id. at 918.  On the one hand, the court held that Minnesota law controlled the demand futility analysis.  See id. at 917.  On the other hand, the court relied explicitly on a standard for demand futility that arises under Delaware law.  See id. 917 n.12.  The court agreed with the parties' characterization that demand would be futile if the plaintiff could demonstrate that "a majority of the Board face[d] a substantial likelihood of liability for various claims in the complaint."  See id. The Kococinski Court noted that this "majority board" standard comes directly from Delaware state law.  Id. (citing In re INFOUSA, Inc. Shareholders Litigation, 953 A.2d 963, 989-900 (Del. Ch. 2007)).  Thus, while the court ostensibly determined that Minnesota law controlled the issue of demand futility, it relied on a standard that was derived from Delaware law.  Although the Kococinski Court acknowledged in a footnote that, under Minnesota law, demand may never be futile because of a board's option to create an SLC, the court did not import the significance and effect of § 302A.241, subd. 1, into the substance of its analysis.

culpable party's brother-in-law.  Ojibwe, 2013 WL 5487419, at *11.  When analyzing the plaintiff's breach of fiduciary duty claim, the court held that because the extent of self-dealing alleged was egregious, demand was futile.  Id.  The court's holding was based on Delaware state law, because the choice-of-law provision in the contract between the parties dictated that Delaware law governed.  Id. (citing King v. Verifone Holdings, Inc., 12 A.3d 1140, 1145 (Del. 2011)).  Here, however, Minnesota state law applies.  Because Delaware state law differs substantially from Minnesota state law regarding demand futility, the Ojibwe Court's holding is irrelevant to this case.

Plaintiff implies that the Ojibwe Court stated in dicta that the outcome of its demand futility analysis would be the same regardless of whether Minnesota or Delaware state law applied.  (See Pls.' Reply at 9 [Doc. No. 43].)  The Ojibwe Court stated in a footnote that it would apply "Delaware law to the parties' claims arising from or relating to the parties' rights and obligations under the Agreement," but "[a]s to all other claims, the [Ojibwe] Court . . . [did] not analyze which state's law applie[d] – Delaware of Minnesota's – because [the court thought that] the choice [did] not affect the outcome." Ojibwe, 2013 WL 5487419, at *5 n.2.  As a preliminary matter, it is unclear whether the court considered the fiduciary duty claim to "arise" from the parties' rights and obligations under the contract.  Arguably, the court determined that the defendant's fiduciary duty arose from the governing contract between the parties.  If that was the case, then Plaintiffs wholly mischaracterize the court's statement.  If, however, the court did not consider the fiduciary duty claim to arise from the parties' obligations under the contract, the Court disagrees with the Ojibwe Court's statement that either state law

would produce the same result.  As the Court has discussed at length above, Minnesota and Delaware law differ greatly with respect to demand futility.  Therefore, Plaintiffs' reliance on Ojibwe is improper.

Plaintiffs also claim that their case is similar to In re AFC.  In In re AFC, the U.S. District Court for the Northern District of Georgia applied Minnesota state law, and held that pre-suit demand was excused since the directors allegedly "conspired to conduct an initial public offering for the purpose of allowing some members of the Board and controlling stockholders to extinguish loan debts with their stock," and "released false and misleading financial reports for the purpose of driving up the price of AFC's stock." 224 F.R.D. at 518.  The In re AFC Court's holding relied explicitly upon Reimel's statement that "in cases involving allegations of patently egregious board conduct such as converting corporate funds or self-dealing, demand almost always would be futile." Reimel, 9 F. Supp. 2d at 1066.  The Georgia district court even noted that Reimel's "patently egregious conduct" principle was based upon the holdings in Grudnosky and Rothwell.  See In re AFC, 224 F.R.D. at 518 (citing Grudnosky, 88 N.W.2d 847 (Minn. 1958); Rothwell, 38 N.W. 772 (Minn. 1888)).  However, as the Court explained above, Grudnosky and Rothwell were decided before the Minnesota legislature codified Minn. Stat. § 302A.241.  Thus, the significance of their holdings and Reimel's reliance on them is questionable.  Accordingly, the Court finds that In re AFC is not persuasive because it relies on cases that fail to analyze the validity of a demand futility claim now that boards may establish SLCs.

Therefore, despite the fact that Plaintiffs' characterize the Gross-Up Payments as egregious since they are "2.5 times as much as Defendants would have to pay absent such agreement," the Court finds that Plaintiffs' reliance on Ojibwe, In re AFC, and Rothwell is misplaced.  Allegations of egregious self-dealing are insufficient for the Court to find that demand is futile here, particularly because one Board member, Dr. Nabel, remains impartial and would not benefit from the Gross-Up Payments.

The Court's decision is bolstered by one of the leading treatises on Minnesota corporation law.  According to § 10.3 of Minnesota Corporation Law and Practice, because Minnesota law enables a corporation to establish an SLC, "it is arguable that demand in Minnesota is never futile since someone not implicated in the lawsuit (i.e., one or more outsiders) always can be commissioned to investigate and to decide whether to pursue or to seek the dismissal of derivative actions initiated by shareholders against directors or officers."  See John H. Matheson & Philip S. Garon, 18 Minn. Prac., Corporation Law & Practice § 10:3 (3d ed. 2013).

For the aforementioned reasons, the Court finds that Plaintiffs' allegations fall short of the particularity required to demonstrate that demand is futile, under Rule 23.09. See Minn. R. Civ. P. 23.09.  The law requires Plaintiffs to exhaust available remedies and make a demand before bringing suit.  While "no single factor is determinative," Dataphase Sys., Inc., 640 F.2d at 113, "an injunction cannot issue if there is no chance of success on the merits," Mid-Am. Real Estate Co., 406 F.3d at 972 (citations omitted). Here, Plaintiffs have no chance of success on the merits because they failed to bring a pre-suit demand on the Board.  Thus, Plaintiffs' claims do not provide "fair ground for

litigation," <u>Watkins Inc.</u>, 346 F.3d at 844, and the Court need not discuss the remaining

three <u>Dataphase</u> factors.  Because Plaintiffs are unable to demonstrate a likelihood of

success on the merits, a preliminary injunction is inappropriate.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  Plaintiff's Motion for Preliminary Injunction [Doc. No. 24] is **DENIED**.


Dated:  December 22, 2014                          s/Susan Richard Nelson
                                                   SUSAN RICHARD NELSON
                                                   United States District Court Judge